REGAN, Judge.
Plaintiff, Joseph P.. Rouse, a “carpet cleaner” employed by William Klein Carpet Cleaning Company, at a weekly wage of $55, instituted this suit against defendant, Globe Indemnity Company, the employer’s compensation liability insurer, endeavoring to recover total and permanent disability under the Workmen’s Compensation Act of Louisiana, LSA-R.S. 23:1021 et seq.; he asserted that as a result of injuries incurred to his right arm on May 29, 1951, when it was caught between the rollers of a “beater” machine, which plaintiff was operating in conjunction with his work, he is entitled to four hundred weeks’ compensation at the rate of $30 per week from May 29, 1951, with interest of 5% per annum on each installment from date of maturity until paid or the sum of $12,000, subject to a credit for compensation previously paid by the defendant.
Defendant answered admitting both the employment and the occurrence of the accident, however, it denied that plaintiff was permanently and totally disabled and insisted that there were no further compensation payments due beyond the period for which compensation had been paid, since plaintiff has completely recovered from his injuries and is, therefore, capable of resuming his employment as a “carpet cleaner” or performing work of a similar character without any residual disability. Alternatively, defendant contends (a) that any disability beyond the period for which has been paid should be classified and compensated as partial disability, rather than as total disability, and (b) that defendant tenders to plaintiff a skin graft operation by a plastic surgeon for the removal of the scar tissue which plaintiff insists has disabled him as a “carpet cleaner.”
Upon the termination of the trial on the merits the - court, a qua, awarded plaintiff compensation of $10,770 payable in 359 weekly installments of $30 per week commencing ■ March 23, 1952, with interest of 5% in each installment from maturity until paid. The judgment further ordered that the expert fees of Drs. Irving Cahen, Dan D. Baker, Robert M..Rose and Neal Owens be fixed at $50 each and for all costs. Hence this appeal by defendant.
The record reveals that plaintiff was right-handed, 40 years of age, weighed 107 pounds and was employed as a “carpet cleaner” by the William Klein Carpet Cleaning Company continuously for eight years prior to the accident. On May 29, 1951, his right arm was inadvertently caught between the rollers of a carpet “beater” machine, which he was engaged in operating at that time. The injury consisted of substantial.lacerations both on the inside and outside area of the elbow or, in the terminology of Dr. Baker, his attending physician furnished by defendant, “he had *371 a severe contusion and laceration of the right elbow region in the antecubital * * *. It involved the skin over the ante-cuhitalfossa and the brachioradialis muscle and, of course, the deep fascia in that region. There was also a laceration in the posterior region in the elbow, too.” He further stated that there was a “complete laceration through the belly of the bracioradialis muscle.”
The ramifications of plaintiff’s occupation as a “carpet cleaner” were numerous, i. e. feeding the carpet “beater” machine, the “shampoo and dusting machine”, operating trucks, moving furniture, lifting and hanging rugs, attaching rugs to poles and pulling them into what has been designated as a drying room and, in fact, doing everything from procuring the rug from the customer, cleaning and storing it, and ultimately delivering the finished product.
Defendant concedes that plaintiff was temporarily disabled and that his wage of $55 per week would entitle him for any period of total disability to the maximum compensation of $30 per week. He was paid compensation at this rate from May 29, 1951, through January 11, 1952, and from March 16, 1952, through March 22, 1952; plaintiff has admitted receipt of these payments.
After plaintiff’s arm healed he resumed his former occupation on December 18, 1951, wherein he continued to work (except for the week of February 9 through February 16, 1952) until March 15, 1952, when he was discharged by his employer. Both plaintiff and his employer agree that plaintiff’s work, upon the resumption thereof was not satisfactory nor comparable to his work prior to the accident and did not manifest any appreciable improvement with the passage of time. Plaintiff insists that he exerted himself but could not, in some instances, fulfill, as he had formerly done, the obligations of his occupation. On the other hand, defendant does not castigate plaintiff for being a malingerer, but is of the rather vague opinion that plaintiff did not make the effort or, to elucidate, plaintiff approached the problem of resuming his former work as a “carpet cleaner” in an “I can’t do it spirit” and persisted in that attitude. Following his discharge by the William Klein Carpet Cleaning Company plaintiff obtained employment on March 20, 1952, in the mailing department of the Wembley Tie Company, Inc. at a salary of $35 per week, and it is conceded that he experiences no, difficulty in fulfilling the tasks which his new position entails. Principally, this occupation consists of operating mimeograph and addresso-graph machines.
The only question posed for our consideration is one of fact and that is whether the medical evidence adduced upon the trial hereof sustained the judgment of the court, a qua, awarding plaintiff total and permanent compensation predicated upon the premise that the injuries sustained by him were of such a nature as to render him incapable of resuming his employment as a “carpet cleaner” or work of a similar character.
An affirmative answer to this question of fact is found in a brief résumé of the testimony.
Plaintiff’s claim to permanent injury rests upon the fact that the scar tissue at the situs of the healed lacerations has a binding effect upon his arm and restricts full movement of the elbow joint. He testified that upon the resumption of his employment with the William Klein Carpet Cleaning Company on December 18, 1951, he made a diligent and conscientious effort to perform his work efficiently, but despite his sincere efforts he was aware of the fact that his work failed to measure up to its former standard because “every time I tried to lift my arm it hurt * * * right in that scar it pulled and hurt.” His chief complaint, as we have revealed hereinbove, was that the healed scar tissue acted as an impediment and prevented his arm from fully functioning; that it was sensitive to such an extent that when anything touched it, even lightly, he spontaneously dropped whatever object he was holding.
Plaintiff’s testimony was corroborated by two fellow employees, his brother, Alvin Rouse and Wei ton Smith, who both stated in substance that plaintiff was unable to perform his work with the same *372 degree of efficiency after the occurrence of the accident as he did prior thereto.
Dr. Irving Cahen testified as a medical expert on behalf of plaintiff; his examination “revealed extensive scarring of the elbow area on the right with a passive, that is, a limitation of motion in what we call extension or straightening of the arm. With my examination, I could gradually produce a complete straight line; but actively, that is, the patient’s ability to do so was definitely restricted. The scar appeared to be sensitive and there was some evidence of adherence of this scar to the underlying tissue. At the conclusion of my examination, I came to the opinion that this patient’s lacerations had healed by scar tissue or cicatrization, and that because of this scarring the patient had limited function of this elbow. I also came to the conclusion that he had sensitivity of the area adjacent to the scar and therefore rendered this arm less efficient in his type of work or any work involving that extremity. * * * I made the indication that the disability was based upon the discomfort caused by stretching of this type scar as well as the sensitization.”
On cross-examination Dr. Cahen testified:
“Q. Did you find any muscular injury to this man’s right arm, Doctor?
A. The type of injury that he sustained must have involved the muscular structure. * * *
“Q. Did you find any sign indicating that his arm muscles were still affected by the injury or impaired by the injury? A. Yes. The scar is adhering to the muscles about the elbow joint, the elbow area in this region, what we call the lateral compartment area; therefore, when this man goes to straighten out his arm, the pulling of that scar on the muscle is an impairment. Therefore, I must say the muscle is involved.”
With regard to the permanency of the disability, Dr. Cahen stated:
“It is possible that with continued use of the arm some further stretching of the scar will occur. That is a time element over which I can not give any definite opinion. In some cases, such scars will relax in periods of months; and in other cases, the scars will be permanently contracted. I don’t feel that the improvement noted over time would be of any great instance in the present disability as of my examination.”
Defendant maintains that an issue of paramount factual importance arising herein relates to an analysis of plaintiff’s diligence, effort and persistence in endeavoring to discharge his work as well after the accident as he did prior thereof. It is conceded that his work after the accident did not measure up to his former level of efficiency, and defendant poses the query as to whether this disparity was due to genuine impairment of plaintiff’s arm or to lack of real effort on plaintiff’s part. As we have observed hereinabove defendant, in insisting upon the latter possibility, does not ask us to conclude from the innuendo that plaintiff is a faker or a malingerer, but contends that the evidence does reveal an attitude of pessimism concerning his ability to resume his occupation and it points out that this pessimism, from the day he resumed his employment, foredoomed his efforts to failure.
In this connection William G. Penny, a working partner in the firm which employed plaintiff, testified “ * * * and he said he wanted to go back to work. He had to work and he would make the best of it * * *. So he did start in that Monday (December 18, 1951) * * *. So this must have been around sometime in March. I think towards the start of the season, you see, and things were picking up a bit and there was no progress.”
“Q. Now did you observe Mr. Rouse from time to time as he was working there after he was hurt, when he went back after he was hurt? A. Well, sometimes to me he seemed as though he was trying to at times; but towards the end, I mean, he did not make any attempt whatsoever to try to use his arm.
******
*373 “Q. Now what about the weight of the rugs of a man doing Mr. Rouse’s work had to carry? A. The average 9 x 12 is around thirty pounds * * * and there is a 12 x IS, I imagine that would he around sixty to sixty-five pounds dry. (The weight of a wet rug is approximately twice that of a dry rug)
*****'*
“Q. During the busy season what hours are worked by your employees? A. From 7 to 5.
“Q. When a man would work overtime how many hours would he work? A. Possibly three hours from six to nine.”
Penny further testified that he had actively participated in the work of - his establishment; he was six feet tall and weighed 220 pounds. He further stated that the work entailed a certain amount of physical strength and that if a person does not have the requisite physical strength “we won’t have him around the plant if that was the case.”
Dr. Baker, the attending physician who administered to plaintiff initially for his injury at the request of the compensation insurer, testified to an affirmative finding of no bone fracture but found a few degrees limitation on the extension of the elbow joint. He was of the opinion that there was sufficient flexion or extension for working use of the arm “within 95% normal.”
Dr. Robert M. Rose testified on behalf of defendant that he found a six-degree limitation of elbow extension and ten-degree limitation of elbow flexion in the right arm and he noticed the healed scar as a limitation of further extension of the elbow joint. He estimated a ten percent disability of the right arm. He did not think that the band he observed through the scar tissue upon extension would produce any substantial measure of pain. He recommended that plaintiff continue using the arm because only by continued use thereof “would he recover full muscle strength or avoid trouble.”
Dr. Neal Owens, a Plastic Surgeon, also testified on behalf of defendant, as follows:
“Well the diagnosis was that of a traumatic injury to the right forearm and elbow region as the result of having the arm caught between two moving rollers which resulted in; No. 1, a circular scar formation about the right elbow involving the ante-cubitalfossa with flexion contraction; No. 2, painful motion at the elbow joint as a result of the scar; No. 3, slight disuse, atrophy and muscular weakness of the right forearm.”
He further stated:
“Q. Now what recommendation did you make, Doctor, as to doing something about this arm condition? A. Well, our recommendation that nothing short of complete excision of the superficial involved scar would give our patient a complete permanent relief of the difficulty.
* * * * * *
“Q. By the Court: What is the extent of the disability of that arm at this time? A. Actual extension that the patient is able to produce with the arm, Judge, is down to 160 degrees as compared to 180 for full * *
We have carefully analyzed the composite legal picture painted by the testimony appearing in the record and are of the opinion that the finding of facts by the trial judge is amply sustained by the medical and lay evidence contained therein.
He predicated his legal conclusions upon the very recent case, decided by the Supreme Court, Wright v. National Surety Corporation, 1952, 221 La. 486, 59 So.2d 695, the rationale of which is succinctly set forth in syllabus 1 thereof; plaintiff, the “operator of asphalt distributor machine used in surfacing blacktop roads was a ‘skilled laborer,’ and, on sustaining fracture of right arm resulting in 60 percent limitation of supination and pronation of arm, so that he could no longer operate asphalt distributor, was totally and permanently disabled within' meaning of Employer’s Liability Act, though he was still *374 able to drive a small truck after his injury.”
In view of the foregoing decision, we are of the opinion that plaintiff was also a skilled laborer and was totally and permanently disabled rather than partially disabled within the scope of the Employer’s Liability Act.
Defendant points out that there is a strong similarity between the work which plaintiff did for William Klein Carpet Cleaning Company before the accident and the work which he concedes he is able to do in the mailing department of Wembley Tie Company, for the reason that the machines which plaintiff manipulated in both places functioned automatically through the simple medium of electric push buttons. Obviously if this comparison is valid, it is, in the ultimate, of the utmost importance since, under the test of total disability most favorable to the defendant, an employee unable to do the work which he formerly did, but able to do work of a similar character is not totally disabled.
The striking difference that occurs to us between the two positions is that plaintiff operates the business machines in his present clerical employment without being required to perform innumerable physical tasks in conjunction therewith, which are beyond his present strength or endurance and productive of pain in his right arm, such as lifting, handling and carrying heavy rugs, guiding the forward, backward and lateral movement of the shampoo and other machines. These tasks principally characterized his occupation as a “carpet cleaner”, and all of which, in addition to the physical strain placed upon his right arm may, at one time or another cause contact with the sensitive scarred area of the injured arm. -It is common knowledge that no physical endurance is entailed in the operation of mimeograph and addressograph machines. We are of the opinion that the foregoing distinction is obvious and fail to discern the existence of even a remote analogy.
Counsel for defendant insists that if we should be of the opinion that plaintiff is either totally or partially disabled then that the defense of tender of a curative operation to plaintiff be considered and ultimately sustained or that plaintiff be barred from claiming further compensation after a specified date. Defendant’s position is that plaintiff’s ability to resume work could and will be restored by virtue of an operation by a competent plastic surgeon and that such an operation will be attended by a minimum, if any, danger of ill effects.
Initially, let us say that the defense of a tendered surgical operation is one frequently urged upon the court, but seldom has it been alternatively ordered.
Dr. Irving Cahen testified that he advised a plastic surgery operation because the present scar pulls on the muscles of the forearm and it may or may not loosen with use.
Dr. Baker, who testified on behalf of defendant, stated that he treated plaintiff for many months and upon whom plaintiff naturally relied, remembered on cross-examination that he advised plaintiff against plastic surgery and against having any further cutting done on his arm.
Drs. Rose and Owens, who examined plaintiff on behalf of defendant disagree as to what specific type of plastic surgery should be performed. Dr. Rose testified “I recommend there a type of repair known as a ‘Z’ because of the manner in which skin flaps are cut to lengthen a scar or in certain sections , of tissue.” He further said that he wanted a number of months to elapse before he could say whether plastic surgery was advisable or not.
Dr. Owens testified that he recommended a complete excision or removal of the scar by a split thickness skin graft. He was opposed to the complete “Z” type graft recommended by Dr. Rose.
“Q. But in any event you do not believe that a ‘z’ type would suffice for the anterior * * *. A. No, sir.
“Q. Or the ante-cubitalfossa ? A. No, sir, or the anterior part of it.”
We are of the opinion that an injured employee is not unreasonable in refusing an operation tendered by the defendant, especially when the defendant’s doctors, who *375 suggest it, disagree as to the advisability of additional surgery and as to the time element or type of operation to perform.
In Benefield v. Zach Brooks Drilling Company, La.App.1952, 59 So.2d 710, 712, the court elucidated at length upon this problem:
“It is further established that the only hope for any real relief of plaintiff’s condition, that is, pain, weakness and inability to fully use his right arm, rests in surgical intervention, the performance of an operation to repair the damage.
******
“We do not think it necessary for this Court, composed of laymen, to pass upon the efficacy, vel non, of what are, obviously, involved and disputed questions of surgical procedure. The one principal fact with which we are here concerned is that the medical experts could not agree among themselves and it is a quite conclusively established fact that plaintiff in this case not only failed to receive reasonable assurance of the probability of a cure of his condition, but was confronted with a violent disagreement between the medical consultants. It is no wonder, indeed, if plaintiff was bewildered and confused and, certainly, it is clear that the result of such confusion had the effect of prejudicing his mind against submission to an operation. Surely under such circumstances his refusal connot possibly be construed as arbitrary or unreasonable, but, on the contrary, must be considered to be completely justifiable.
“We have no difficulty in resolving the conclusion that in instances where distinguished medical scientists are in disagreement as to the character, nature, procedure and result of proposed surgical intervention, it would be presumptuous and unjust for any court to pronounce the judgment sought by defendants herein.”
The dilemma of whether plaintiff should submit to surgery is one which must initially be decided by the injured employee, that is, it is discretionary in the absolute, and he has the option of submitting or refusing the tendered operation. It is only in the event an employee refuses to submit to tendered surgery that the dilemma poses the problem of judicial intervention, and there then devolves upon the court the inescapable obligation of its office, calling for the exercise of the wisdom of a Solomon. As laymen, the court, after its analysis of the medical jargon, environmental facts and peculiar circumstances, must then decide whether the refusal of the employee has been arbitrary or reasonable. However, in the intellectual process of arriving at its conclusion the court should always reserve unto itself a broad latitude for the individualization of each case. Therefore, where the defendant produced three doctors, one of whom, the attending physician, advised plaintiff against any further surgery, the second of whom tentatively recommended the “Z” type surgery conditioned upon the passage of time, which the third said would not be successful — ■ surely the plaintiff cannot be said to be unreasonable or arbitrary in not submitting to either operation. It would be presumptuous and unjust for this court to pronounce the judgment sought by defendant herein.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.